UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ANDREW J.J. WOLF,<br><br>              Plaintiff,<br><br>      v.<br><br>IDAHO STATE BOARD OF CORRECTION; DAVID McCLUSKY; DODDS HAYDEN; KAREN NIELL; JOSH TEWALT; JEFF ZMUDA; ASHLEY DOWELL; CHAD PAGE; ROSS CASTLETON; RANDY BLADES; AMANDA GENTRY; WALTHER "WALLY" CAMPBELL; JOHN "JACK" FRASER; KEITH YORDY; RANDY VALLEY; TIMOTHY RICHARDSON; TERRIE ROSENTHAL; MATHEL CASTLETON; MARK WAY; COREY SEELY; SABINO J. RAMIREZ; BENJAMIN K. LEE; ALAN STEWART; DARRYL BLANCHARD; CHESTER MARTIN; AMANDA DIETZ; LUKE KORMYLO; MICHAEL J. RICE; ALBERTO RAMIREZ; GARY HARTGROVE; SUSAN WESSLES; JEREMY HRANACA; MR. TEATS; RICHARD WINTERS; J. DOE 1; AMANDA HOTTINGER; NICHOLAS HALE; and RAUL MITCHELL, JR., each sued in their individual and official capacities, and their successors in office,<br><br>              Defendants. | Case No. 1:20-cv-00025-BLW<br><br>**INITIAL REVIEW ORDER BY SCREENING JUDGE** |

INITIAL REVIEW ORDER BY SCREENING JUDGE - 1

The Clerk of Court conditionally filed Plaintiff Andrew J.J. Wolf's initial Complaint as a result of Plaintiff's status as an inmate and in forma pauperis request. Plaintiff has since filed an Amended Complaint as instructed by the Court. The Court now reviews the Amended Complaint to determine whether it should be summarily dismissed in whole or in part under 28 U.S.C. §§ 1915 and 1915A. Having reviewed the record, and otherwise being fully informed, the Court enters the following Order directing Plaintiff to file a second amended complaint if Plaintiff intends to proceed.

## SCREENING STANDARDS

The Court must review complaints filed by prisoners seeking relief against a governmental entity or an officer or employee of a governmental entity, as well as complaints filed in forma pauperis, to determine whether summary dismissal is appropriate. The Court must dismiss a complaint or any portion thereof that states a frivolous or malicious claim, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B) & 1915A(b).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint fails to state a claim for relief under Rule 8 if the factual assertions in the complaint, taken as true, are insufficient for the reviewing court plausibly "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." *Id.* In other words, although Rule 8 "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (internal quotation marks omitted). If the facts pleaded are "merely consistent with a defendant's liability," or if there is an "obvious alternative explanation" that would not result in liability, the complaint has not stated a claim for relief that is plausible on its face. *Id.* at 678, 682 (internal quotation marks omitted). A court is not required to comb through a plaintiff's exhibits or other filings to determine if the complaint states a plausible claim.

## DISCUSSION

Plaintiff is a prisoner in the custody of the Idaho Department of Correction ("IDOC"), currently incarcerated at the Idaho Maximum Security Institution ("IMSI"). Some of the events giving rise to Plaintiff's claims occurred while Plaintiff was incarcerated at the Idaho State Correctional Institution ("ISCI").

Plaintiff brings numerous claims against thirty-eight Defendants. Plaintiff primarily asserts claims under 42 U.S.C. § 1983, alleging violations of the First, Eighth, and Fourteenth Amendments. *Am. Compl.*, Dkt. 12, at 1, 5–19. Plaintiff also asserts claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 701, *et seq. Id.* at 18. Finally, Plaintiff invokes "International Law and National Standards regarding torture, cruel and inhuman or degrading treatment." *Id.* at 16.

Plaintiff asserts claims not only on behalf of himself, but also purportedly on behalf of a class of similarly-situation prisoners. However, the Court has not certified a class in this action. Moreover, because Plaintiff is not an attorney, he cannot represent others in litigation. Thus, Plaintiff may not rely on injuries allegedly suffered by other inmates but must, instead, assert only his own claims. *See C.E. Pope Equity Trust v. United States*, 818 F.2d 696, 697 (9th Cir. 1987); *Russell v. United States*, 308 F.2d 78, 79 (9th Cir. 1962) (per curiam).

Plaintiff has not alleged sufficient facts to proceed with the Amended Complaint. The Court will, however, grant Plaintiff 60 days to file a second amended complaint. Any such amendment should take into consideration the following.

1.      **Section 1983 Claims**

Plaintiff brings claims under 42 U.S.C. § 1983, the civil rights statute. To state a plausible civil rights claim, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To be liable under § 1983, "the defendant must possess a purposeful, a knowing, or possibly a reckless state of mind." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472 (2015). Negligence is not actionable under § 1983, because a negligent act by a public official is not an abuse of governmental power but merely a "failure to measure up to the conduct of a reasonable person." *Daniels v. Williams*, 474 U.S. 327, 332 (1986).

Prisoners do not forfeit all of their constitutional rights simply because they are prisoners. However, many constitutional rights are appropriately restricted within prison

walls, and "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Bell v. Wolfish*, 441 U.S. 520, 545–46 (1979) (internal quotation marks omitted).

Prison officials generally are not liable for damages in their individual capacities under § 1983 unless they personally participated in the alleged constitutional violations. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Iqbal*, 556 U.S. at 677 ("[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct."). Section 1983 does not allow for recovery against an employer or principal simply because an employee or agent committed misconduct. *Taylor*, 880 F.2d at 1045.

However, "[a] defendant may be held liable as a supervisor under § 1983 'if there exists ... a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). A plaintiff can establish this causal connection by alleging that a defendant (1) "set[] in motion a series of acts by others"; (2) "knowingly refus[ed] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury"; (3) failed to act or improperly acted in the training, supervision, or control of his subordinates"; (4) "acquiesc[ed] in the constitutional deprivation"; or (5) engag[ed] in "conduct that showed a reckless or callous indifference to the rights of others." *Id*. at

1205–09. A plaintiff may also seek injunctive relief from officials who have direct responsibility in the area in which the plaintiff seeks relief. *See Rounds v. Or. State Bd. of Higher Educ.*, 166 F.3d 1032, 1036 (9th Cir. 1999).

Pursuant to the Eleventh Amendment, § 1983 claims against states and state entities cannot be heard in federal court. *Hans v. Louisiana*, 134 U.S. 1, 16–18 (1890); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Quern v. Jordan*, 440 U.S. 332, 342–44 (1979) (holding that § 1983 does not constitute a waiver of state sovereign immunity). Additionally, claims for monetary damages against state officials in their official—as opposed to individual—capacities are barred by the Eleventh Amendment. *Hafer v. Melo*, 502 U.S. 21, 27 (1991). Such claims are also implausible under Rule 8 because states, state entities, and "[s]tate officers sued for damages in their official capacity" are not "persons" subject to suit under § 1983. *Id.*; *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

A claim that a supervisor or training official failed to adequately train subordinates ordinarily requires that, "in light of the duties assigned to specific officers or employees[,] the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the [supervisor or training official] can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). That is, to maintain a failure-to-train claim, a plaintiff must allege facts showing a "pattern of violations" that amounts to deliberate indifference. *Connick v. Thompson*, 563 U.S. 51, 72 (2011).

INITIAL REVIEW ORDER BY SCREENING JUDGE - 6

Likewise, "a failure to supervise that is sufficiently inadequate may amount to deliberate indifference" that supports a § 1983 claim, but there generally must be a pattern of violations sufficient to render the need for further supervision obvious. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (internal quotation marks omitted). That is, if a supervisory or training official had "knowledge of the unconstitutional conditions" through such a pattern of violations—including knowledge of the "culpable actions of his subordinates"—yet failed to act to remedy those conditions, that official can be said to have acquiesced "in the unconstitutional conduct of his subordinates" such that a causal connection between the supervisor and the constitutional violation is plausible. *Starr*, 652 F.3d at 1208.

The constitutional rights of convicted prisoners are subject to limitations arising "both from the fact of incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). The standard governing most constitutional claims of incarcerated persons was outlined by the United States Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987). There, the Court examined a free speech issue in the context of prison officials prohibiting correspondence between inmates residing at different state institutions.

The Court held in *Turner* that "when a prison regulation [or other official action] impinges on inmates' constitutional rights, the regulation [or action] is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. A court must consider

INITIAL REVIEW ORDER BY SCREENING JUDGE - 7

four factors to determine whether a prison regulation or official action is valid under *Turner*: (1) whether there is a "rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether "there are alternative means of exercising the right that remain open to prison inmates"; (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether "ready alternatives" at a "de minimis cost" exist, which "may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." *Id.* at 89-93.

The *Turner* analysis appropriately allows prison officials substantial leeway in the management of their prisons. "Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Id.* at 89. Thus, federal courts must apply the *Turner* test so as to "accord great deference to prison officials' assessments of their interests." *Michenfelder v. Sumner*, 860 F.2d 328, 331 (9th Cir. 1988).

A plaintiff cannot simply restate these standards of law in a complaint. Instead, a plaintiff must provide specific facts supporting the elements of each claim and must allege facts showing a causal link between each defendant and Plaintiff's injury. Alleging "the mere possibility of misconduct" is not enough. *Iqbal*, 556 U.S. at 679.

### A.    *Statute of Limitations Issues*

Some of Plaintiff's claims, including the entirety of Plaintiff's sixth cause of action, appear to be untimely. *See Am. Compl.* at 13–16.

Inasmuch as the civil rights statute provides a remedy but does not itself confer any substantive rights, the statute of limitation period for filing a civil rights suit is the statute of limitation period for personal injuries in the state where the claim arose. *Wilson v. Garcia*, 471 U.S. 261, 280 (1985), *abrogated on other grounds by Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004). In Idaho, civil rights actions are governed by a two-year statute of limitations. Idaho Code § 5-219.

Although the state statute of limitations governs the time period for filing a § 1983 claim, federal law governs when that claim accrues, or arises. *Elliott v. City of Union City*, 25 F.3d 800, 801-02 (9th Cir. 1994). Under the "discovery rule," a claim accrues "when the plaintiff knows or has reason to know of the injury" that is the basis of the claim. *Lukovsky v. City & Cty. of San Francisco*, 535 F.3d 1044, 1048 (9th Cir. 2008) (internal quotation marks omitted). That is, the statute of limitations begins to run when the plaintiff becomes aware of the actual injury—not "when the plaintiff suspects a legal wrong." *Id*.

If a plaintiff cannot show that his claim accrued within the statute of limitations period, he still may file a lawsuit beyond the limitations deadline if he can show that the statute should have been tolled (or stopped) for a certain period of time during the deadline period within which he should have filed the lawsuit. Pursuant to the Prison Litigation Reform Act ("PLRA"), the "statute of limitations must be tolled while a prisoner completes the mandatory exhaustion process." *Brown v. Valoff,* 422 F.3d 926, 943 (9th Cir. 2005).

In addition to tolling under the PLRA, state tolling law applies to § 1983 actions unless important federal policy will be undermined. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 464-65 (1975); *Pesnell v. Arsenault*, 543 F.3d 1038, 1043 (9th Cir. 2008). Idaho law allows for statutory tolling of the statute of limitations for a person's juvenile status or insanity. Idaho Code § 5-230. However, the Idaho Supreme Court has determined that "[s]tatutes of limitation in Idaho are not tolled by judicial construction but rather by the expressed language of the statute"; therefore, equitable tolling is not available in Idaho. *Wilhelm v. Frampton*, 158 P.3d 310, 312 (Idaho 2007).

The doctrine of equitable *estoppel*, however, is available in Idaho. While it "does not 'extend' a statute of limitation," equitable estoppel works in a similar manner to prevent a party who has falsely represented or concealed a material fact with actual or constructive knowledge of the truth "from pleading and utilizing the statute of limitations as a bar, although the time limit of the statute may have already run." *J.R. Simplot Co., v. Chemetics, Int'l Inc.*, 887 P.2d 1039, 1041 (Idaho 1994). Equitable estoppel requires a showing of four elements: "(1) a false representation or concealment of a material fact with actual or constructive knowledge of the truth; (2) that the party asserting estoppel did not know or could not discover the truth; (3) that the false representation or concealment was made with the intent that it be relied upon; and (4) that the person to whom the representation was made, or from whom the facts were concealed, relied and acted upon the representation or concealment to his prejudice." *Id.*

Plaintiff filed the initial complaint in this case on January 15, 2020, when the

Court received that complaint.[1] Thus, allowing for a maximum of thirty days to exhaust

the prison administrative process, it would appear any claims that arose before December

16, 2017, are time-barred. If Plaintiff includes any such claims in a second amended

complaint, he must explain why he believes those claims are not subject to dismissal as

untimely.

Plaintiff's reliance on the continuing violation doctrine is misplaced. *See* Dkt. 12

at 13. That doctrine—which can render timely certain claims arising outside the

limitations period—applies only in narrow circumstances.

"[T]he statute of limitations runs separately from each discrete act." *RK Ventures,*

*Inc. v. City of Seattle,* 307 F.3d 1045, 1061 (9th Cir. 2002). Therefore, any claim based

on a discrete act is untimely unless that discrete act—or discrete failure to act—took

place within the limitations period. *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101,

113 (2002). One of the only viable pathways to maintaining a cause of action for past acts

occurring outside the statute of limitations period is where a plaintiff's claims are based

*not* on discrete acts, but rather on "a series of separate acts that collectively constitute one

unlawful practice," such a claim of a hostile work environment; that is, a true "continuing

---

[1] The last page of the initial complaint states that Plaintiff deposited the complaint in the prison legal mail system on January 10, 2020. *See Houston v. Lack*, 487 U.S. 266, 270-71 (1988) (holding that, under the "mailbox rule," a legal document is deemed filed on the date a prisoner delivers it to the prison authorities for filing by mail, rather than the date it is actually filed with the clerk of court. *Douglas v. Noelle*, 567 F.3d 1103, 1107 (9th Cir. 2009) (applying the mailbox rule to civil rights actions). However, because the initial complaint was unsigned, there is no admissible evidence as to when Plaintiff delivered the complaint to prison authorities for filing. *See* Dkt. 1. Thus, Plaintiff is not entitled to the benefit of the mailbox rule.

violation." *RK Ventures, Inc.,* 307 F.3d at 1061 n .13 (internal quotation marks and alteration omitted).

In the Amended Complaint, Plaintiff challenges a number of different decisions of different prison officials, each of which constitutes a discrete act—for example, decisions to house Plaintiff in a particular housing unit and decisions on how to address disciplinary offenses. Such choices cannot reasonably be considered a collective unlawful practice to which the continuing violation doctrine might apply. Therefore, that doctrine is unavailable to render timely any claims arising before December 16, 2017.

### B.    *Claims Based on Prison Policies or Procedures*

Some of Plaintiff's claims allege violations of the IDOC's Policies or Standard Operating Procedures ("SOPs"), such as Policies 318 and 319 and their SOPs, which govern disciplinary offense procedures and restrictive housing, respectively. *See* http://forms.idoc.idaho.gov/WebLink/Browse.aspx?startid=99295&dbid=0 (IDOC website). However, § 1983 provides a cause of action only for violations of *federal* law. That is, so long as minimum constitutional requirements are met, a prison need not comply with its "own, more generous procedures." *Walker v. Sumner*, 14 F.3d 1415, 1420 (9th Cir. 1994), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995); *see also Huron Valley Hosp. v. City of Pontiac*, 887 F.2d 710, 714 (6th Cir. 1989) ("[Section 1983] is thus limited to deprivations of *federal* statutory and constitutional rights. It does not cover official conduct that allegedly violates *state* law.") (relying on *Baker v. McCollan*, 443 U.S. 137, 146 (1979)); *Lowrey v. Walton Cty. Sheriff's Dep't*, No. 3:07-CV-121CDL, 2008 WL 660332, at *3 (M.D. Ga. Mar. 5, 2008) (unpublished)

INITIAL REVIEW ORDER BY SCREENING JUDGE - 12

("It is not the function of this Court to review regulations established by prison authorities unless a constitutional violation is presented.").

Therefore, Plaintiff's § 1983 claims based on violations of any IDOC Policies or SOPs are implausible.

### C.    Claims Based on Alleged Violations of Injunctive Relief Orders Issued in *Balla v. IBOC*

Some of Plaintiff's claims, including Plaintiff's first and third causes of action, assert that Defendants are in contempt of orders issued in the separate class action case of *Balla v. IBOC*, Case No. 1:81-cv-01165-BLW (D. Idaho). *See Am. Compl.* at 5–6, 8–9. However, any argument that a person is not complying with a court order in another case cannot be brought in a separate action but must, instead, be asserted in the original action. Therefore, Plaintiff's claims based on alleged violations of the *Balla* orders are implausible and should not be included in any second amended complaint.[2]

Plaintiff is correct that *Balla* class members, like other prisoners, may assert § 1983 claims in individual lawsuits, such as this one, that are independent from the *Balla* case. *See Am. Compl.* at 8. That is, although a claim that a prison official has violated a *Balla* order is not cognizable in a separate, individual lawsuit asserted by a *Balla* class member, a claim that the official has violated § 1983 itself *is* cognizable—even if the conduct of which the plaintiff complains would also violate a *Balla* order. It is perhaps a fine distinction, but a significant one. *See Balla v. IBOC*, Case No. 1:81-cv-01165-BLW,

---

[2] *Balla* is currently in the midst of proceedings on the defendants' motion to terminate prospective relief, in which the Court will determine whether the injunctive relief orders in that case should be terminated.

Dkt. 1282 at 5 (D. Idaho April 25, 2019) ("Importantly, the parties' Stipulation to voluntarily terminate the prospective relief in *Balla I* Order Nos. 1, 2, 7, 8, and 9 does *not* contain a release or waiver of any past, present, or future constitutional or statutory claim, nor does it otherwise require any class member to give up any substantive right. For example, Order No. 1 of *Balla I* involves dietary issues. Even after voluntary termination of the prospective relief identified in Order No. 1, a prisoner who believes that his dietary needs are not being met, in violation of the Constitution, may still bring an individual § 1983 lawsuit asserting that violation.").

Therefore, the Court will now evaluate Plaintiff's claims under the specific constitutional provisions upon which Plaintiff relies, as opposed to evaluating them under the auspices of the *Balla* orders.

### D.    *First Amendment Claims*

On December 21, 2017, Plaintiff was at a paralegal appointment with Defendant Stewart, the prison paralegal. Plaintiff was seeking copies for grievance filings and court mailings when an incident occurred between Plaintiff and Stewart. Plaintiff describes the incident as follows:

> 59.    [Plaintiff] was at a Paralegal Appointment to make copies of Exhibits to be attached to a 9th Cir. Court Pleading that was being filed that day when Defendant Stewart inquired what he was filing. [Plaintiff] explained it was a Reply to a Response filed by the Respondents on a [sic] appellate court motion. [Plaintiff] first copied some of the original Exhibits as the originals that day were being submitted with a Grieance [sic]. He then attached these particular copies to the Court pleading and handed the entire pleading to Stewart and asked for 3 copies so all parties could have a complete copy including himself. Stewart then asked

why he was coping [sic] some of the same stuff he had just copied. [Plaintiff] explained that what he had copied was the Concern and Grievance and those were being submitted to the grievance coordinator on the way back to his unit by depositing them in the Grievance Box located in front of the ISCI Gym. Stewart then left the copy machine an [sic] went in his office. [Plaintiff] followed him to the window where he assists inmates and requested 2 envelopes as well to mail out a copy and an original to the Court. Stewart slammed the window shut so [Plaintiff] sat down and calmly waited with Inmate D. Broadway, … who was also waiting for Paralegal Assistance.

60.     While [Plaintiff] and Inmate Broadway were waiting for Stewart to come out of his office and finish making the copies … C/O Collins came in the ISCI Resource Center and asked what they were doing. Both told him they were waiting on Stewart to finish making their copies for filing with the Courts. Defendant Stewart with his service window closed pointed at [Plaintiff] an [sic] then the door while C/O Collins seen [sic] this. Collins then told [Plaintiff] he needed to gather his things and leave. [Plaintiff] explained he still needed [to] finish his copies and mailings. Collins then told [Plaintiff] he would have to put in for another appointment to complete the task. Wolf then gathered his things and complied with C/O Collin's [sic] direct order and left.

*Am. Compl.* at 9.

Stewart described the interaction as follows:

On December 21, 2017, while making copies for [Plaintiff] at his 0900 appointment, [Plaintiff] had some exhibits for his filing which were also grievance related. After making copies of these papers for his filing, [Plaintiff] placed the copies back into his stack of pleadings yet to be copied. I told [Plaintiff] I had just made copies of those exhibits and saw him put the copies back into the stack. I had already provided copies sufficient for [Plaintiff's] filing as he described, and re-copying those would result in an extra set of copies of grievance material, which is not permitted by policy. In front of the other inmates present, [Plaintiff] strongly insisted I make copies of the papers again. I again said that I had made

INITIAL REVIEW ORDER BY SCREENING JUDGE - 15

copies of the exhibits sufficient for his filing already and
copying them a second time would be extra copies which are
not permitted. [Plaintiff] now became extremely demanding,
started leaning across the copier toward me, pointing his
finger at me, glaring at me aggressively, and forcefully
pointing at his papers attempting to intimidate me into
making the unauthorized copies. [Plaintiff] was also
physically pumping himself up. At that point I was concerned
for my safety. I quickly went to my office and closed the
door, and called for Officer Collins to respond to the
Resource Center to remove [Plaintiff]. Even after Officer
Collins quickly arrived, [Plaintiff] rushed past Officer Collins
to my window continuing his demands. I was able to close
my window before [Plaintiff] could reach it, but he leaned
over the small counter and got right up near the glass,
continuing to try to intimidate me. [Plaintiff] reluctantly and
minimally complied with Officer Collins, slamming things
down on the table while gathering his things, but [Plaintiff]
continued his harassing and intimidating actions, making
threats of legal action, and demanding loudly for me to
identify my supervisor.

[Plaintiff] showed an eagerness to confront me because of not
immediately get [sic] his way, regardless of the underlying
issue.

Dkt. 12-1 at 23 (Ex. to Am. Compl., Wolf 00022).

As a result of the incident, Stewart issued Plaintiff a Disciplinary Offense Report

("DOR") for harassment. *Am. Compl.* at 10.

                    i.      Retaliation Claims

Plaintiff asserts that Defendant Stewart issued the harassment DOR in retaliation

for Plaintiff's request for copies. He alleges that other Defendants' actions with respect to

grievance and DOR procedures were also taken in retaliation for Plaintiff's protected

conduct.

INITIAL REVIEW ORDER BY SCREENING JUDGE - 16

The First Amendment includes the right to be free from retaliation for exercising constitutional rights. An inmate asserting a retaliation claim must show the following: "(1) ... that a state actor took some adverse action against the inmate (2) because of (3) that prisoner's protected conduct, ... that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) [that] the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted). "[B]are allegations" of a retaliatory motive are insufficient to support a retaliation claim. *Rizzo v. Dawson*, 778 F.2d 527, 532 n.4 (9th Cir. 1985); *see also Wood v. Yordy*, 753 F.3d 899, 905 (9th Cir. 2014) ("We have repeatedly held that mere speculation that defendants acted out of retaliation is not sufficient."). Rather, when analyzing a prison official's proffered reasons for allegedly retaliatory conduct, the Court must "afford appropriate deference and flexibility" to that official. *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (internal quotation marks omitted).

Not every retaliatory act taken by an official can be considered an adverse action that chills the exercise of protected speech. The proper inquiry asks whether the official's action "would chill or silence a person of ordinary firmness from future First Amendment activities." *Mendocino Envt'l Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (internal quotation marks omitted). If it would not, then "the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (internal quotation marks omitted). *See also Morris v. Powell*, 449 F.3d 682, 686 (5th Cir. 2006) ("The [*de minimis*] standard achieves

the proper balance between the need to recognize valid retaliation claims and the danger of federal courts embroiling themselves in every disciplinary act that occurs in state penal institutions.") (internal quotation marks and alteration omitted).

A plaintiff asserting a retaliation claim under § 1983 also "must show a causal connection between a defendant's retaliatory animus and [the plaintiff's] subsequent injury." *Hartman v. Moore*, 547 U.S. 250, 259 (2006) (*Bivens* action). Retaliatory motivation is not established simply by showing an adverse action by the defendant *after* protected speech. Instead, the plaintiff must show a nexus between the two. *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (stating that a retaliation claim cannot rest on "the logical fallacy of *post hoc, ergo propter hoc*, literally, 'after this, therefore because of this'"). Therefore, although the timing of an official's action can constitute circumstantial evidence of retaliation—if, for example, an adverse action was taken shortly after the official learned about an inmate's exercise of protected conduct—there generally must be something more than mere timing to support an inference of retaliatory intent. *Pratt*, 65 F.3d at 808.

The causal nexus requirement of a retaliation claim is a "but-for" causation test. If the adverse action would have been taken even without the inmate's exercise of protected conduct, the plaintiff cannot satisfy the causation element of the retaliation claim. *Hartman*, 547 U.S. at 260.

Finally, even if an inmate proves that his protected conduct was the but-for cause of an adverse action by a prison official, the inmate's retaliation claim fails so long as

INITIAL REVIEW ORDER BY SCREENING JUDGE - 18

that action also reasonably advanced a legitimate penological interest. The state unquestionably has a legitimate interest in maintaining institutional order, safety, and security in its prisons, *Rizzo*, 778 F.2d at 532, and the "plaintiff bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains," *Pratt*, 65 F.3d at 806.

Plaintiff has not plausibly alleged that Defendant Stewart acted with a retaliatory motive in issuing Plaintiff the harassment DOR. At most, the Amended Complaint plausibly asserts that Defendant Stewart issued the DOR because he felt harassed— whether or not Plaintiff intended to harass him. There is nothing giving rise to a reasonable inference that Stewart subjectively intended to retaliate against Plaintiff. The same is true with respect to the other Defendants' alleged approval of Stewart's actions. Therefore, Plaintiff's retaliation claims are implausible.

      ii.      <u>Right-to-Petition Claims</u>

The First Amendment to the United States Constitution includes the right to petition the government for redress of grievances. Incarcerated individuals retain the right to petition for redress, which includes the right to use a prison grievance process. *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995), *abrogated on other grounds by Shaw v. Murphy*, 532 U.S. 223, 230 n.2 (2001).

Plaintiff alleges that the harassment DOR issued by Defendant Stewart violated his right to petition for redress. However, Plaintiff was not prohibited from pursuing the grievance process with respect to the interaction with Stewart. *See Am. Compl.* at 9–11

INITIAL REVIEW ORDER BY SCREENING JUDGE - 19

(stating that Plaintiff submitted concern forms and a grievance as to this issue). Thus, Plaintiff's right to petition for redress was not infringed, and this claim is implausible.

### E.    Due Process Claims

Plaintiff also asserts claims under the Due Process Clause of the Fourteenth Amendment, which prohibits state action that deprives a person of life, liberty, or property without due process of law. A person cannot obtain relief on a due process claim unless he demonstrates that he was deprived of one of these protected interests. *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 459-60 (1989). Because prisoners' liberty is necessarily circumscribed as a result of conviction, prisoners have a liberty interest in freedom from restraint only if a change occurs in confinement that imposes an "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

If a prisoner plausibly alleges that he was deprived of a protected liberty interest, a court must then consider the process that the prisoner was due. This determination must be made on a case-by-case basis. *Wolff v. McDonnell*, 418 U.S. 539, 560 (1974) ("Consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.") (internal quotation marks and alteration omitted).

The "essence of due process" is notice and an opportunity to be heard. *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976). Due process is a flexible concept and calls for such procedural protections as the particular situation demands. *Id*. The specific process to

INITIAL REVIEW ORDER BY SCREENING JUDGE - 20

which a person is entitled depends on the consideration of three factors: (1) "the private interest ... affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used[] and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id*. at 335.

i.    Claims Based on Placement and Retention in Administrative Segregation

Plaintiff asserts that he was placed and retained in administrative segregation, or "ad-seg," at IMSI without due process. *Am. Compl*. at 16–18. Ad-seg is a restrictive housing unit reserved "for those offenders who pose a threat to life, property, self, staff, or other offenders or when an offender's continued presence threatens the secure and orderly operation of the facility." *See* IDOC SOP 319.02.01.001 at 1, http://forms.idoc.idaho.gov/WebLink/0/edoc/341649/Restrictive%20Housing%20-%20SOP.pdf, "Restrictive Housing."

In February 2018, Plaintiff was notified that he was to have a hearing to determine whether he should be placed in ad-seg. *Am. Compl*. at 17. Defendant Martin presented Plaintiff with a form that would waive the 24-hour notice requirement provided for by prison policy. Plaintiff was not required to sign the form.

Plaintiff asked why he was not given advance notice, of "documentary evidence" that would be introduced at the hearing, or of his right to present witnesses and to have a staff hearing assistant. *Id*. Martin stated that no additional information would be

forthcoming, and that if Plaintiff did not sign the waiver, the hearing would be scheduled for the following week.

Plaintiff signed the waiver and proceeded to the restrictive housing hearing. Two days later, he was notified that he would be placed in ad-seg. Plaintiff claims that he did not receive a "written statement of fact findings as to evidence relied on for Ad-Seg placement." *Id*. On May 18, 2018, Plaintiff was transferred to ad-seg, where he has remained housed. *Id*. at 2.

Pursuant to prison policy, an ad-seg review hearing should occur every 120 days—but must occur at least annually—to determine whether continued placement in the restrictive housing unit is appropriate. *See* IDOC SOP 319.02.01.001 at 15–18. Plaintiff alleges that his 120-day ad-seg review hearing was not conducted in October 2018 "due to understaffing of security staff at the facility." *Am. Compl.* at 17.

Plaintiff claims that his annual ad-seg review hearings, which occurred in March 2019 and March 2020, violated due process because the final decision was made by a Headquarters Administrative Review Committee, regardless of the recommendations made by the hearing officers. *Id*. at 18. Plaintiff also claims the hearings violated due process because he was not provided documentation, notice of the review hearing, or notice of the recommendation of the hearing officers or the final decision by the Committee.

A prisoner does not have a liberty interest in being housed in a particular prison facility or a particular unit within a prison facility. *See Meachum v. Fano*, 427 U.S. 215,

218 (1976) ("Whatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections …."); *McKune v. Lile*, 536 U.S. 24, 39 (2002) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). This is true even with respect to restrictive housing units: "administrative segregation, even in a single cell for twenty-three hours a day, is within the terms of confinement ordinarily contemplated by a sentence" and, therefore, does not implicate a protected liberty interest. *Anderson v. Cty. of Kern*, 45 F.3d 1310, 1316 (9th Cir.), *opinion amended on denial of reh'g*, 75 F.3d 448 (9th Cir. 1995). Because Plaintiff did not have a liberty interest in not being placed in ad-seg, his due process claims based on that placement are implausible.

Further, even if Plaintiff did have a liberty interest in avoiding placement in ad-seg, Plaintiff unquestionably had notice that he was being considered for ad-seg placement and that he was to have a hearing on that potential placement. And Plaintiff did, in fact, have that hearing. Due process requires no more.

Finally, assuming that Plaintiff has a liberty interest in avoiding *continued* retention in ad-seg, the Amended Complaint establishes that he has received due process. Ad-seg review hearings were conducted in March 2019 and March 2020 to determine whether it remained appropriate to house Plaintiff in ad-seg. Plaintiff does not allege that he did not have notice of the ad-seg review hearing policy, so the fact that he might not have received an additional notice immediately before the review hearings is of no

consequence. Thus, Plaintiff received notice and an opportunity to be heard with respect to ad-seg placement and retention.

Though one of Plaintiff's ad-seg review hearings was not conducted, due to understaffing, that fact alone does not render Plaintiff's due process claims plausible. The annual ad-seg review hearings in 2019 and 2020 were sufficient to satisfy due process. Also, there is nothing in the Amended Complaint to suggest that the failure to have enough staff to conduct the review hearing was an intentional or reckless decision— rather than one based on a good-faith mistake or negligence, which is not actionable under § 1983. *See Daniels*, 474 U.S. at 332.

For the above reasons, Plaintiff's due process claims based on his placement and retention in ad-seg are implausible.

ii.      Claims Based on Disciplinary Offense Reports

Plaintiff also alleges that his due process rights were violated with respect to three DORs.[3]

With respect to a procedural due process claim regarding prison disciplinary proceedings and disciplinary segregation, a district court must analyze three factors in determining whether a prisoner has a liberty interest in avoiding discipline: (1) whether disciplinary segregation is similar to discretionary forms of segregation (such as administrative segregation); (2) whether a comparison between the plaintiff's confinement and conditions in the general population shows that the plaintiff suffered no

---

[3] Other DORs challenged by Plaintiff appear barred by the statute of limitations, as discussed above in Section 1.A.

INITIAL REVIEW ORDER BY SCREENING JUDGE - 24

"major disruption in his environment"; and (3) whether the length of the plaintiff's sentence is affected. *Sandin*, 515 U.S. at 486–87. Applying these factors in *Sandin*, the Supreme Court held that a prisoner lacked a protectable liberty interest in avoiding 30 days of confinement in disciplinary segregation and, therefore, had no due process claim. *Id*. at 487.

If a prisoner has a protected liberty interest in avoiding discipline, the Due Process Clause requires that the prisoner receive notice of the charges against him and an opportunity to respond. *Mathews*, 424 U.S. at 348. Due process in a prison disciplinary hearing is satisfied if the inmate receives notice of the charges, of the evidence against him, and of the reasons for the disciplinary action. *Wolff*, 418 U.S. at 563–66. An inmate has a right "to call witnesses and present documentary evidence in his defense," except when doing so would be "unduly hazardous to institutional safety or correctional goals." *Id.* at 566.

a)      *Unidentified DOR in December 2017*

In December 2017, Plaintiff was issued a DOR. *Am. Compl.* at 6. The Amended Complaint does not describe the offense conduct or disciplinary violation charged in the DOR.[4]

Plaintiff wanted to review the disciplinary policy before his DOR hearing. *See* http://forms.idoc.idaho.gov/WebLink/0/edoc/281212/Disciplinary%20Procedures%20for

---

[4] This DOR may actually be the harassment DOR discussed above in Section 1.D.i, and below in Section 1.E.ii.b. Because Plaintiff's allegations are unclear on this point, and because the Amended Complaint discusses the DORs in separate causes of action, the Court will assume for purposes of this Order that they are two different DORs. Plaintiff should clarify his allegations in any second amended complaint.

%20Inmates.pdf, "Disciplinary Procedures for Inmates." The electronic copy of the current policy includes a hyperlink to the list of prohibited conduct for which an inmate may be served a DOR. *Id.* at 4. Plaintiff wanted to review the policy because it had recently been revised, but Plaintiff does not allege that he did not have notice of the prior version of the SOP and list of prohibited conduct. *Am. Compl*. at 6.

Plaintiff reviewed the hard copy of the revised SOP, which did not have the list of prohibited conduct attached as an appendix. Therefore, Plaintiff was unable to review the revised list. *Id*.

Plaintiff notified staff of this problem and was told he could view the list on a computer, but when Plaintiff attempted to access it, he was given a message that the document was "not available for viewing." Officer Wilson told Plaintiff that she would add the list to the viewable CD and "told [Plaintiff] to watch the callout." *Id*. Plaintiff also notified Defendant Way, who said he would investigate the issue.

However, before the issue was resolved, the prison was placed on "secure/lockdown" status. The disciplinary SOP was not available in the ISCI housing units for checkout during lockdown, so Plaintiff was unable to review it. A hearing officer came to Plaintiff's housing unit and informed him that he was there for a hearing on Plaintiff's DOR. Plaintiff refused to participate because, among other things, he still had been unable to review the updated list of prohibited conduct. *Id*. at 7.

Because of Plaintiff's refusal, the hearing was not conducted. The ultimate resolution of this unidentified DOR is unclear from the Amended Complaint.

INITIAL REVIEW ORDER BY SCREENING JUDGE - 26

Defendant Castleton had been made aware of Plaintiff's request to view the list of offenses. In a grievance, Plaintiff had asked for the dismissal of all DORs issued between the revision of the SOP—August 7, 2017—and the date when a copy of the offenses was available to inmates. Castleton responded that "there are not substantial enough changes to the codes" to warrant such relief. *Id*.

The revised list of offenses was made available on January 16, 2018. *Id*. Plaintiff claims that the revisions to SOP 318.02.01.001 were, in fact, substantial. The revision reclassified some offenses and added new offenses. *Id*. Plaintiff does not allege that the offense with which he was charged was one of these new offenses.

The Amended Complaint does not describe any of the circumstances relevant to the *Sandin* factors with respect to the DOR issued in early December 2017. Plaintiff does not even identify the offense with which he was charged, and he certainly does not plausibly allege that the offense was altered in any substantive way by the revision to SOP 318.02.01.001. Because Plaintiff did not have a liberty interest with respect to the DOR, whether or not Plaintiff had prior notice of any substantive change to SOP 318.02.01.001 is irrelevant. Therefore, Plaintiff's due process claims based on this DOR are implausible.

> b)   *Harassment DOR*

The second DOR at issue in Plaintiff's due process allegations is the harassment DOR issued by Defendant Stewart on December 26, 2017, following the incident during Plaintiff's paralegal appointment. *Am. Compl*. at 10. An inmate commits the disciplinary offense of harassment if the inmate engages in "[w]ords, actions, … gestures, [or] racial

slurs intended to harass or intimidate staff, visitors, inmates, or the public." *See*

http://forms.idoc.idaho.gov/WebLink/0/edoc/273087/Disciplinary%20Offenses.pdf,

IDOC SOP 318.02.01.001, "Disciplinary Offenses."

Plaintiff was found guilty of the harassment DOR but was given no penalty. *Am. Compl*. at 11. Plaintiff appealed and argued, among other things, that he was unable to review the prohibited conduct in the revised SOP. Warden Yordy affirmed the DOR, stating that the harassment offense was the same in both the earlier and the revised versions of SOP 318.02.01.001. *See* Dkt. 12-2 at 14–15 (Ex. to *Am. Compl*., Wolf 00038).

Plaintiff has not plausibly alleged that he had a liberty interest with respect to the harassment DOR. Plaintiff received no punishment and, therefore, suffered no major disruption in his environment. Being found guilty of the harassment DOR did not constitute an atypical and significant hardship, and Plaintiff's due process claims based on that DOR are implausible. *See Sandin*, 515 U.S. 484.

> c)   *Sexual Abuse DOR*

Defendant Blanchard issued Plaintiff a DOR, initially for rape, on January 26, 2018. Defendant Way instructed Blanchard to rewrite the DOR "so as to conform to the correct offense." *Am Compl*. at 11. Blanchard did so, and the DOR was reclassified as "Sexual Abuse 1 – Level 1 Class A." This offense requires "[p]enetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person without the consent of the victim or by coercion." IDOC SOP

318.02.01.001, "Disciplinary Offenses." Plaintiff maintained that the alleged victim had

falsely accused Plaintiff. *Am. Compl.* at 12.

> The DOR, issued after an investigation, stated as follows:

>> On January 15, 2018 at 1945, [Plaintiff] was witnessed by the Assistant Commander standing over another inmate while the inmate was laying down on the ledge in the lower right shower in unit 14.

>> [Plaintiff] and the inmate witnessed in the shower both received PREA [Prison Rape Elimination Act] interviews by the Shift Commander. The inmate that was in the shower with [Plaintiff] reported that [Plaintiff] forcefully penetrated him anally twice with his fingers before staff was able to respond to the shower. [Plaintiff] denied being in the shower with this inmate during his interview with Ada County Detectives and investigations staff on two multiple occasions.

>> During the interview with the suspected victim, the victim displayed characteristics of truthfulness that were consistent with his statements.

>> [Plaintiff] in an interview on 1-19-18 said that the inmate was in the shower with him although he was able to get out of the shower before staff caught them in the shower. At the conclusion [of] the PREA investigations, it was determined that [Plaintiff] displayed several attempts to falsify statements to avoid disciplinary measures.

Dkt. 12-2 at 25 (Ex. to *Am. Compl.*, Wolf 00049).

> Plaintiff states that he was not permitted to review an audio recording of the

investigative interview with the accusing inmate. Plaintiff also alleges that the hearing

officer, Defendant Way, did not base his decision on the entirety of the evidence, but

instead only on the first and last paragraph of the DOR, which included hearsay

statements. *Am. Compl*. at 12.

Plaintiff was found guilty of the DOR. He was placed on 15 days of segregation, 20 days of telephone restriction, and 60 days of property and commissary restriction. *Id*. Plaintiff appealed. Warden Yordy affirmed the DOR, citing Plaintiff's inconsistent versions of the event. Yordy relied particularly on Plaintiff's denial that he was even in the shower, stating that staff "clearly saw the two of you in the shower together with the other inmate perched on the wall." Dkt. 12-3 at 5 (Ex. to *Am. Compl*., Wolf 00052A).

Applying the *Sandin* factors, the Court concludes that Plaintiff has not plausibly alleged a liberty interest in avoiding discipline with respect to the sexual abuse DOR. Although Plaintiff was placed in disciplinary segregation for 15 days, the Amended Complaint does not plausibly allege that the conditions in disciplinary segregation are so much more restrictive than those in other types of segregation that a mere 15 days' confinement would create a liberty interest in avoiding disciplinary segregation. Moreover, the Court simply cannot conclude that temporary telephone, commissary, and property restriction—of no more than 60 days—constituted a major disruption in Plaintiff's environment.

The sanctions Plaintiff received for the sexual abuse DOR—short-term disciplinary segregation, short-term telephone restriction, and short-term property and commissary restriction—do not constitute the type of atypical and significant hardships that give rise to an interest protected by the Due Process Clause. *See Sandin*, 515 U.S. 484. Thus, Plaintiff did not have a liberty interest with respect to the sexual abuse DOR.

In addition, even if Plaintiff did have a liberty interest in avoiding discipline for the sexual abuse DOR, Plaintiff received all the process to which he was entitled. A staff member witnessed Plaintiff and another inmate in a suspicious position in the shower, and investigation was conducted, and Plaintiff was issued the DOR. Both Plaintiff and the other inmate were interviewed, and Plaintiff was given a hearing on the DOR. This constituted sufficient notice and an opportunity to be heard, thus satisfying Plaintiff's right to due process. *See Mathews*, 424 U.S. at 348.

For the foregoing reasons, Plaintiff's due process claims based on the sexual abuse DOR are not plausible.

### F.      *Eighth Amendment Claims*

The Eighth Amendment protects prisoners against cruel and unusual punishment. Although prison conditions may be restrictive—even harsh—without violating the Eighth Amendment, prison officials are required to provide prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *Hoptowit v. Ray,* 682 F.2d 1237, 1246 (9th Cir. 1982), *abrogated on other grounds by Sandin*, 515 U.S. 472. Unlike most other constitutional claims, Eighth Amendment claims are not subject to the *Turner* analysis. *Jordan v. Gardner*, 986 F.2d 1521, 1530 (9th Cir. 1993) (en banc).

To state a claim under the Eighth Amendment, prisoners must show that they are "incarcerated under conditions posing a substantial risk of serious harm," or that they have been deprived of "the minimal civilized measure of life's necessities" as a result of the defendants' actions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation

marks omitted). An Eighth Amendment claim requires a plaintiff to satisfy both (1) an objective standard, "that the deprivation was serious enough to constitute cruel and unusual punishment, and (2) a subjective standard, that the defendant acted with "deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc).

As for the objective prong of the analysis, "[n]ot every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Rather, the deprivation alleged must be objectively sufficiently harmful or, in other words, sufficiently "grave" or "serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

With respect to the subjective prong of an Eighth Amendment violation, "deliberate indifference entails something more than mere negligence, [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." *Whitley*, 475 U.S. at 319.

To exhibit deliberate indifference, a defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth

Amendment, no matter how severe the risk." *Gibson v. Cty. of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

i.      <u>Conditions of Confinement in Ad-Seg</u>

Plaintiff claims that the conditions of confinement in ad-seg violate the Eighth Amendment to the United States Constitution.[5] Ad-seg inmates are confined in a single cell for 23 hours per day, on average. They may leave their cells for "showers, 1-hour per week for Kiosk use, 1-hour of recreation per day, and 2 hours a week for a visit if approved by staff."[6] *Am. Compl*. at 18.

The Court concludes that these conditions are among those "ordinarily contemplated by a [criminal] sentence." *Anderson*, 45 F.3d at 1316; *see also Ruiz v. Cate*, 436 F. App'x 760, 761 (9th Cir. 2011) (unpublished) (upholding dismissal of Eighth Amendment ad-seg claim) (relying on *Anderson*, 45 F.3d at 1316). The conditions Plaintiff describes certainly do not constitute a deprivation of "the minimal civilized measure of life's necessities," nor has Plaintiff plausibly alleged that ad-seg conditions place him at "a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

---

[5] Plaintiff asserts that conditions on death row also violate the Eighth Amendment. However, because Plaintiff is not a death row prisoner, any claim that he has suffered an actionable injury because of the conditions on death row is implausible.

[6] Plaintiff also claims, in a conclusory manner, that ad-seg has given him cataracts. *Am. Compl.* at 19. However, there is nothing in the Amended Complaint to support a reasonable inference that Plaintiff's cataracts were caused by the conditions in ad-seg, rather than by natural causes.

Therefore, the Amended Complaint fails to state a plausible Eighth Amendment claim based on the conditions in ad-seg.

ii.  Medical Care for Cataracts

Plaintiff also asserts that he has suffered permanent damage to one eye "due to defendants [sic] delay in having [his cataract] treated." *Am. Compl*. at 19. This bare allegation is far too vague to state a plausible claim for inadequate medical treatment.

The Eighth Amendment includes the right to adequate medical and mental health treatment in prison. Prison officials or prison medical providers can be held liable if their "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Regarding the objective standard for prisoners' medical care claims, "society does not expect that prisoners will have unqualified access to health care." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Therefore, "deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id*. The Ninth Circuit has defined a "serious medical need" in the following ways:

> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] ... [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain ....

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992) (internal citations omitted), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

INITIAL REVIEW ORDER BY SCREENING JUDGE - 34

In the medical context, deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05 (footnotes omitted). Medical malpractice or negligence does not support a cause of action under the Eighth Amendment, *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (per curiam), and a delay in medical treatment does not violate the Eighth Amendment unless that delay causes further harm, *McGuckin*, 974 F.2d at 1060. Additionally, there is no constitutional right to an outside medical provider of one's own choice. *See Roberts v. Spalding,* 783 F.2d 867, 870 (9th Cir. 1986) ("A prison inmate has no independent constitutional right to outside medical care additional and supplemental to the medical care provided by the prison staff within the institution.").

Differences in judgment, as to appropriate medical diagnosis and treatment, between an inmate and prison medical providers—or, for that matter, between medical providers—are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi*, 391 F.3d at 1058 (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Stated another way, a plaintiff must plausibly allege that medical providers chose one treatment over the plaintiff's preferred treatment "even though they knew [the plaintiff's preferred treatment] to be medically necessary based on [the plaintiff's] records and prevailing medical standards." *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1117 (N.D. Cal. 2015). If medical personnel have been "consistently responsive to [the inmate's] medical needs," and the plaintiff has not shown that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," there has been no Eighth Amendment violation. *Toguchi*, 391 F.3d at 1061.

If Plaintiff intends to assert a medical-treatment claim in a second amended complaint, he should keep the above legal standards in mind.

## 2.    Claims under the ADA and the RA

Plaintiff also invokes the ADA and the RA, which generally prohibit discrimination on the basis of an individual's disability. *Am. Compl*. at 18. The ADA and the RA are congruent statutes in purpose and application. *Clark v. California*, 123 F.3d 1267, 1270 (9th Cir. 1997). The evidence required for bringing a RA claim is the same as that for an ADA claim, with the additional requirement that the disability discrimination be committed by an entity receiving federal financial assistance. *See* 29 U.S.C. § 794(a). Therefore, the standards of an ADA claim also apply to a RA claim.

Title II of the ADA applies to an "individual with a disability who, with or without reasonable modifications to rules, policies, or practices … meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). Title II extends to prison inmates

INITIAL REVIEW ORDER BY SCREENING JUDGE - 36

who are deprived of the benefits of participation in prison programs, services, or activities because of a disability. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 211 (1998). In order to proceed with an ADA claim, Plaintiff must show (1) that he has a disability; (2) that he is otherwise qualified to participate in or receive a public entity's services, programs, or activities; (3) that he was denied the benefits of those services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) that such exclusion, denial of benefits, or discrimination was *by reason of* his disability. *See Weinreich v. Los Angeles Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997).

The governmental entity is required to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). "The ADA does not require perfect parity among programs offered by various facilities that are operated by the same umbrella institution. But an inmate cannot be categorically excluded from a beneficial prison program based on his or her disability alone." *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1221 (9th Cir. 2008).

In contrast to a § 1983 claim, by statutory definition a Title II ADA claim must be brought against the state or the state entity. *See U.S. v. Georgia*, 546 U.S. 151 (2006) (holding that Title II of the ADA validly abrogates Eleventh Amendment immunity for states for conduct that actually violates the Fourteenth Amendment). Claims against

individuals asserted under the ADA are treated as official capacity claims because no individual capacity claims exist under the statute. *See, e.g., Becker v. Oregon*, 170 F. Supp. 2d 1061 (D. Or. 2001).

Plaintiff has not alleged any facts that would support a claim under the ADA or the RA. Plaintiff does not plausibly allege that he is disabled, nor does he point to any action on the part of any Defendant that constitutes discrimination *on account of* a disability.

If Plaintiff wishes to include a Title II ADA claim against IDOC in his amended complaint, he must include allegations of a specific disability and that Defendants intentionally discriminated against Plaintiff on the basis of that disability.

### 3.   Claims Based on International Standards or Declarations

Plaintiff also relies on international standards and declarations, specifically those of the United Nations. *See Am. Compl*. at 16, 19. However, such declarations do not create a private right of action in federal court. *See, e.g., Sosa v. Alvarez-Machain*, 542 U.S. 692, 734 (2004) (stating that the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights "did not [themselves] create obligations enforceable in the federal courts"); *Bey v. Malec*, 2018 WL 4585472 at *2 (N.D. Cal. Sept. 25, 2018) (dismissing a plaintiff's claims for violations of the United Nations Declaration on the Rights of Indigenous Peoples and the Universal Declaration of Human Rights because neither declaration is "binding in federal court"). Therefore, Plaintiff's claims based on international standards or declarations are implausible and must be dismissed.

INITIAL REVIEW ORDER BY SCREENING JUDGE - 38

**STANDARDS FOR SECOND AMENDED COMPLAINT**

If Plaintiff chooses to file a second amended complaint, Plaintiff must demonstrate how the actions complained of have resulted in a deprivation of Plaintiff's constitutional rights. *See Ellis v. Cassidy*, 625 F.2d 227, 229 (9th Cir. 1980), *abrogated on other grounds by Kay v. Ehler*, 499 U.S. 432 (1991). Plaintiff must also allege a sufficient causal connection between each defendant's actions and the claimed deprivation. *Taylor*, 880 F.2d at 1045; *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). "Vague and conclusory allegations of official participation in civil rights violations are not sufficient to withstand a motion to dismiss" or to survive screening under 28 U.S.C. §§ 1915 and 1915A. *Ivey v. Bd. of Regents of Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982); *see also Iqbal*, 556 U.S. at 678 ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." (internal quotation marks and alteration omitted)).

Rather, for each claim against each defendant, Plaintiff must state the following: (1) the name of the person or entity that caused the alleged deprivation of Plaintiff's constitutional rights; (2) facts showing the defendant is a state actor (such as state employment or a state contract) or a private entity performing a state function; (3) the dates on which the conduct of the defendant allegedly took place; (4) the specific conduct or action Plaintiff alleges is unconstitutional; (5) the particular federal constitutional or statutory provision that Plaintiff alleges has been violated; (6) facts alleging that the

elements of the violation are met; (7) the injury or damages Plaintiff personally suffered; and (8) the particular type of relief Plaintiff is seeking from each defendant.

Further, any second amended complaint must contain all of Plaintiff's allegations in a single pleading and cannot rely upon, attach, or incorporate by reference other pleadings or documents. Dist. Idaho Loc. Civ. R. 15.1 ("Any amendment to a pleading, whether filed as a matter of course or upon a motion to amend, must reproduce the entire pleading as amended. The proposed amended pleading must be submitted at the time of filing a motion to amend."); *see also Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474 (9th Cir. 1997) ("[An] amended complaint supersedes the original, the latter being treated thereafter as non-existent."), *overruled in part on other grounds by Lacey v. Maricopa County*, 693 F.3d 896, (9th Cir. 2012) (en banc); *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc*., 896 F.2d 1542, 1546 (9th Cir. 1990) (holding that the district court erred by entering judgment against a party named in the initial complaint, but not in the amended complaint).

Plaintiff must set forth each different factual allegation in a separate numbered paragraph. The amended complaint must be legibly written or typed in its entirety, and it should be clearly designated as the "Second Amended Complaint." Plaintiff's name and address should be clearly printed at the top left corner of the first page of each document filed with the Court.

If Plaintiff files a second amended complaint, Plaintiff must also file a "Motion to Review the Second Amended Complaint." If Plaintiff does not amend within 60 days, or

if the amendment does not comply with Rule 8, this case may be dismissed without further notice. *See Knapp v. Hogan*, 738 F.3d 1106, 1110 (9th Cir. 2013) ("When a litigant knowingly and repeatedly refuses to conform his pleadings to the requirements of the Federal Rules, it is reasonable to conclude that the litigant simply *cannot* state a claim.").

## ORDER

**IT IS ORDERED:**

1.   Plaintiff has 60 days within which to file a second amended complaint as described above. If Plaintiff does so, Plaintiff must file (along with the amended complaint) a Motion to Review the Second Amended Complaint. If Plaintiff does not amend within 60 days, this case may be dismissed without further notice.

2.   Because a second amended complaint is required in this case, Plaintiff's Motion for Appointment of Counsel (Dkt. 5) is DENIED AS MOOT. Plaintiff may renew the request for counsel if he files a second amended complaint.

3.   Plaintiff's Motion to Take Judicial Notice (Dkt. 7) is GRANTED IN PART, to the extent that the Court takes judicial notice of its own records in the cases identified in the Motion. The Motion is DENIED to the extent that it requests judicial notice of the truth of the allegations in any of those records. If Plaintiff intends to cite to any records of other cases in this

Court, he must do so by case number, docket number, and page number, to

the extent possible.

DATED: May 12, 2020

B. Lynn Winmill
U.S. District Court Judge